ORIGINAL

Approved: _____
SAGAR K. RAVI
Assistant United States Attorney

Before:  THE HONORABLE JAMES L. COTT
         United States Magistrate Judge
         Southern District of New York    **19MAG10177**

- - - - - - - - - - - - - - - - - -X
                                    :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA            :
                                    :   Violations of
         - v. -                     :   18 U.S.C. §§ 371,
                                    :   1349, and 1956
JOSEPH IORHEMBA ASAN JR., and       :
CHARLES IFEANYI OGOZY,              :   COUNTY OF OFFENSE:
                                    :   NEW YORK & WESTCHESTER
              Defendants.           :
                                    :
- - - - - - - - - - - - - - - - - -X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    VINCENT Q. LAI, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Bank Fraud and Wire Fraud)

    1.   From at least in or about February 2018 through at least in or about September 2019, in the Southern District of New York and elsewhere, JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344.

    2.   It was a part and an object of the conspiracy that JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, willfully and knowingly would and did transmit and cause to be transmitted by

means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

3. It was further a part and an object of the conspiracy that JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and others known and unknown, willfully and knowingly would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Receive Stolen Property)

4. From at least in or about February 2018 through at least in or about September 2019, in the Southern District of New York and elsewhere, JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, a violation of Title 18, United States Code, Section 2315.

5. It was a part and object of the conspiracy that JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and others known and unknown, would and did receive, possess, conceal, store, barter, sell, and dispose of goods, wares, merchandise, securities, and money, of the value of $5,000 and more, which had crossed a state boundary after being stolen, unlawfully converted, and taken, knowing the same to have been stolen, unlawfully converted, and taken, in violation of Title 18, United States Code, Section 2315.

### OVERT ACTS

6. In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

        a. On or about February 28, 2019, JOSEPH IORHEMBA ASAN JR., the defendant, received a wire transfer of approximately $421,722 consisting of fraud proceeds in a business bank account ASAN controlled.

        b. Between in or about March 2018 and in or about March 2019, CHARLES IFEANYI OGOZY, the defendant, received approximately $77,000 in bank accounts that OGOZY controlled from business bank accounts controlled by ASAN that received fraud proceeds.

        (Title 18, United States Code, Section 371.)

## COUNT THREE
### (Money Laundering Conspiracy)

    7. From at least in or about February 2018 through at least in or about September 2019, in the Southern District of New York and elsewhere, JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

    8. It was a part and object of the conspiracy that JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and others known and unknown, knowing that the property involved in certain financial transactions represented proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud and bank fraud conspiracy charged in Count One of this Complaint, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

        (Title 18, United States Code, Section 1956(h).)

    The bases for my knowledge and for the foregoing charges are, in part, as follows:

    9. I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with law enforcement

agents, witnesses, and others, as well as my examination of report and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview of the Conspiracy

10.  Since in or about February 2018, JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, who are both members of the U.S. Army Reserves, participated in a scheme to commit fraud against victims across the United States, defraud banks, and to launder fraud proceeds in bank accounts that they controlled. Among other things, ASAN and OGOZY opened bank accounts in the names of fake businesses; received or attempted to receive over $3 million in fraud proceeds; and withdrew fraud proceeds in cash and/or transferred fraud proceeds to other co-conspirators, including to each other.

11.  The funds laundered by JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, were obtained primarily through (a) business email compromises, in which members of the scheme gained unauthorized access to or spoofed email accounts and impersonated employees of a company or third parties engaged in business with the company in order to fraudulently induce the victims to transfer money to bank accounts under the control of members of the scheme, including ASAN and OGOZY; and (b) romance scams, in which members of the scheme deluded unsuspecting older women and men into believing they were in a romantic relationship with a fake identity assumed by members of the scheme and used false pretenses to cause the victims to transfer money to bank accounts under the control of members of the scheme, including ASAN and OGOZY.

12.  Based on my review of U.S. Army records for JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, including security clearance applications submitted by them, I have learned the following, in substance and in part:

   a.   ASAN and OGOZY have been members of the U.S. Army Reserves from in or about February 2018 through the present.

b. ASAN is a dual citizen of Nigeria and the United States. OGOZY is a citizen of Nigeria.

c. ASAN's phone number of record ends in 9208 (the "Asan Phone Number").

d. OGOZY's phone number of record ends in 3892 (the "Ogozy Phone Number").

e. ASAN is associated with an address in Carteret, New Jersey (the "Carteret Address") and an address in Daytona Beach, Florida (the "Daytona Beach Address").

f. OGOZY is associated with an address in Hackensack, New Jersey and an address in West Chester, Ohio (the "West Chester Address").

### Victim-1, Victim-2, and Victim-3

13. Based on the FBI's investigation of a business email compromise involving a large equipment distributor located in Pennsylvania ("Victim-1"), including the FBI's interview of an executive of Victim-1 and documents provided by Victim-1 to the FBI, I have learned the following, in substance and in part:

a. In or about early 2019, Victim-1 agreed to sell equipment to a chemical distributor located in New Jersey ("Victim-2") for approximately $421,722. In connection with this transaction, Victim-1 and Victim-2 utilized a broker located in Melville, New York ("Victim-3").

b. On or about February 28, 2019, an individual purporting to be from Victim-1 sent Victim-3 an email representing, in substance and in part, that payment for the above-described transaction should be deposited in a bank account ("Uxbridge Account-1") in the name of Uxbridge Capital, LLC ("Uxbridge") at a credit union for active duty, retired, and reserve U.S. Armed Forces personnel ("Bank-1"). As a result, Victim-3 initiated a transfer of approximately $421,722 from Victim-2 to Uxbridge Account-1. The wire was processed in Yonkers, New York.

c. Victim-1 has never done business with Uxbridge and did not authorize the transfer to Uxbridge Account-1.

14. Based on my review of bank records for Uxbridge Account-1 at Bank-1, I have learned the following, in substance and in part:

    a. On or about February 28, 2019, Uxbridge Account-1 received a deposit of approximately $421,722.

    b. On or about March 1, 2019, Bank-1 was advised that the wire instructions provided to Victim-3 were fraudulent and recalled the wire transfer. As a result of the recall of the wire transfer, Uxbridge Account-1 was frozen by Bank-1.

    c. Between on or about March 5 and 26, 2019, when Uxbridge Account-1 was frozen due in part to the fraudulent wire transfer from Victim-2, JOSEPH IORHEMBA ASAN JR., the defendant, called Bank-1 multiple times to inquire why he was not able to access Uxbridge Account-1.

### Victim-4

15. Based on the FBI's investigation of a business email compromise involving a Marine Corps veterans organization ("Victim-4"), including the FBI's interview of an executive of Victim-4 (the "Victim-4 Executive") and documents provided by Victim-4 to the FBI, I have learned the following, in substance and in part:

    a. On or about August 9, 2018, an individual purporting to be the Victim-4 Executive sent unauthorized emails using the Victim-4 Executive's email address to the treasurer of Victim-4 requesting a wire transfer of $6,850.20 to an account in the name of Uxbridge ("Uxbridge Account-2") at a bank headquartered in Manhattan ("Bank-2"). As a result, the treasurer of Victim-4 initiated the wire transfer request.

    b. At no time did the Victim-4 Executive authorize the above-described wire transfer.

16. Based on my review of bank records for Uxbridge Account-2 at Bank-2, I have learned, in substance and in part, that on or about August 10, 2018, Uxbridge Account-2 received a wire transfer of $6,850.20 from Victim-4.

### Victim-5

17. Based on the FBI's investigation of a romance scam involving a female individual ("Victim-5"), including the FBI's

interview of Victim-5 and documents provided by Victim-5 to the FBI, I have learned the following, in substance and in part:

a. Victim-5 was a 67-year-old woman residing in North Carolina who began to use an online dating website for individuals aged 50 and older after her husband had passed away. Through that online dating website, Victim-5 began an online relationship with a purported male individual ("Individual-1") who represented himself to have a son and daughter in Canada.

b. Victim-5 communicated with Individual-1 through phone calls, text messages, and emails. Although Victim-5 did not meet Individual-1 in person, Individual-1 sent Victim-5 photos of himself, including a copy of his purported U.S. passport. In addition, individuals purporting to be Individual-1's daughter and lawyer also contacted Victim-5 on behalf of Individual-1.

c. At some point during the course of their relationship, Individual-1 told Victim-5, in substance and in part, that he was in the Philippines working as an engineer on a bridge and that he was unable to access his American bank accounts because someone had committed bank fraud and deposited money into his account. Individual-1 subsequently requested that Victim-5 send money to him, and Individual-1 informed Victim-5 that Individual-1 would pay Victim-5 back with interest. Individual-1 instructed Victim-5 to transfer money to, among other accounts, Uxbridge Account-2.

d. As a result of the representations made by Individual-1, on or about August 30, 2018, Victim-5 transferred approximately $75,000 to Uxbridge Account-2.

e. Victim-5 never received any money from Individual-1.

18. Based on my review of bank records for Uxbridge Account-2 at Bank-2, I have learned, in substance and in part, that on or about August 30, 2018, Uxbridge Account-2 received a wire transfer of approximately $75,000 from Victim-5.

Victim-6

19. Based on the FBI's investigation of a business email compromise involving a home mortgage company ("Victim-6"), including the FBI's interview of two employees of Victim-6 and

documents provided by Victim-6 to the FBI, I have learned the following, in substance and in part:

  a. On or about November 2, 2018, an individual purporting to be the chief executive officer of Victim-6 (the "Victim-6 Executive") sent an email to the accounting manager of Victim-6 requesting a wire transfer of approximately $18,280 to an account in the name of Uxbridge ("Uxbridge Account-3") at a community bank headquartered in Bayonne, New Jersey ("Bank-3"). As a result, the accounting manager of Victim-6 initiated the wire transfer.

  b. At no time did the Victim-6 Executive authorize the above-described wire transfer.

20. Based on my review of bank records for Uxbridge Account-3 at Bank-3, I have learned, in substance and in part, that on or about November 2, 2018, Uxbridge Account-3 received a wire transfer of approximately $18,280 from Victim-6, which was later reversed due to fraud.

### Victim-7

21. Based on the FBI's investigation of a romance scam involving a female individual ("Victim-7"), including the FBI's interview of Victim-7 and my review of documents provided by Victim-7 to the FBI, I have learned the following, in substance and in part:

  a. Victim-7 was a 57-year-old woman residing in Illinois who began a relationship through an online dating website with a purported male individual ("Individual-2") who represented that he lived in Newark, New Jersey.

  b. Victim-7 communicated with Individual-2 through phone calls, text messages, and emails. Although Victim-7 did not meet Individual-2 in person, Individual-2 sent Victim-7 photos of himself, including a copy of his purported New Jersey driver's license. In addition, an individual purporting to be a financial consultant contacted Victim-7 on behalf of Individual-2.

  c. At some point during the course of their relationship, Individual-2 told Victim-7, in substance and in part, that he was in Dubai working on an engineering project where a member of his team was hurt on the job. Individual-2 requested that Victim-7 send money to Individual-2 to help the

injured employee. In addition, Individual-2 also requested that Victim-7 send Individual-2 money related to a $1.9 million investment, of which Individual-2 promised Victim-7 that she would receive half.

   d. Individual-2 instructed Victim-7 to transfer money to, among other accounts, an account in the name of Renegade Logistics, LLC ("Renegade") in Florida. Individual-2 represented that Renegade was a broker who could get money to Individual-2 abroad faster.

   e. As a result of the representations made by Individual-2, Victim-7 obtained and sent a cashier's check in the amount of approximately $35,000 to Renegade on or about June 4, 2019. In addition, on or about July 15, 2019, Victim-7 initiated a wire transfer of approximately $9,550 to an account in the name of Renegade ("Renegade Account-1") at a bank headquartered in Atlanta, Georgia ("Bank-4").

   f. Victim-7 never received any money from Individual-2.

  22. Based on my review of bank records for Renegade Account-1 and a second account in the name of Renegade ("Renegade Account-2") at Bank-4, I have learned the following, in substance and in part:

   a. On or about June 5, 2019, a cashier's check in the amount of approximately $35,000 from Victim-7 was deposited into Renegade Account-1. Two days later, Renegade Account-1 transferred (i) approximately $15,833 to a personal account in the name of a JOSEPH IORHEMBA ASAN JR., the defendant; and (ii) approximately $17,485 to a personal account in the name of ASAN's mother.

   b. On or about July 16, 2019, Renegade Account-2 received a deposit of approximately $9,550 from Victim-7.

  23. Based on my review of bank records for four bank accounts in the name of Uxbridge (Uxbridge Account-1, Uxbridge Account-2, Uxbridge Account-3, and "Uxbridge Account-4", collectively, the "Uxbridge Accounts") at four different banks, I have learned the following, in substance and in part:

   a. JOSEPH IORHEMBA ASAN JR., the defendant, was the sole beneficial owner and signatory on the Uxbridge Accounts.

b. The address for ASAN and Uxbridge provided in connection with the opening of the Uxbridge Accounts was the Carteret Address.

c. The phone number for Uxbridge and ASAN provided by ASAN in connection with the opening of the Uxbridge Accounts was the Asan Phone Number.

d. Uxbridge Account-1 was a business account opened at Bank-1 in the name of Uxbridge in or about September 2018. A business services membership application submitted to Bank-1 by ASAN stated, among other things, that Uxbridge is engaged in "buying and flipping homes, security and tech consulting."

e. Uxbridge Account-2 was a business account opened at Bank-2 in the name of Uxbridge in or about July 2018. Account opening information provided by ASAN to Bank-2 stated, among other things, that Uxbridge was involved in "purchasing and investing in real estate within the US . . . and abroad, to countries such as Nigeria . . . ." A business deposit account application for Uxbridge Account-2 listed CHARLES IFEANYI OGOZY, the defendant, as an advisor for Uxbridge and an address in Piscataway, New Jersey (the "Piscataway Address") for OGOZY.

f. Uxbridge Account-3 was a business account opened at Bank-3 in the name of Uxbridge in or about September 2018. Account opening information provided by ASAN to Bank-3 stated, in substance and in part, that Uxbridge was involved in real estate and foreign investment, that the purpose of Uxbridge Account-3 would be "general operating funds" and the primary source of funding would be wires, and that ASAN was a U.S. Army employee.

g. Uxbridge Account-4 was a business account opened at a bank headquartered in New Jersey ("Bank-5") in the name of Uxbridge in or about September 2018. A certificate of formation for Uxbridge provided to Bank-5 stated, among other things, that Uxbridge was formed on or about July 30, 2018 and that its business purpose is "real estate, foreign investment and stock option consultancy."

h. Between at least in or about August 2018 and at least in or about May 2019, the Uxbridge Accounts had deposits greater than approximately $500 that totaled approximately $1.36 million and withdrawals greater than approximately $500 that totaled approximately $1.34 million. A majority of the deposits in the Uxbridge Accounts consisted of large wire transfers from various individuals and businesses or cash deposits, and many of

the withdrawals consisted of transfers to other accounts under the control of ASAN and OGOZY. In total, the Uxbridge Accounts transferred approximately $61,100 to accounts in the name of OGOZY.

24. Based on my review of bank records for five bank accounts in the name of Renegade (Renegade Account-1, Renegade Account-2, "Renegade Account-3," "Renegade Account-4," and "Renegade Account-5," collectively, the "Renegade Accounts") at four different banks, I have learned the following, in substance and in part:

    a. JOSEPH IORHEMBA ASAN JR., the defendant, was the sole beneficial owner and signatory on the Renegade Accounts.

    b. The address for Renegade provided in connection with the opening of Renegade Account-1, Renegade Account-2, and Renegade Account-4 was the Daytona Beach Address. The address for Renegade provided in connection with the opening of Renegade Account-3 and Renegade Account-5 was an address in Miami, Florida (the "Renegade Miami Address").

    c. The phone number for Renegade and ASAN provided by ASAN in connection with the opening of the Renegade Accounts was the Asan Phone Number.

    d. Renegade Account-1 and Renegade Account-2 were business accounts opened at Bank-4 in the name of Renegade in or about February 2019.

    e. Renegade Account-3 was a business account opened at Bank-1 in the name of Renegade in or about January 2019. A business services membership application submitted to Bank-1 by ASAN stated, among other things, that Renegade is engaged in "procurement and shipment of client goods worldwide." In a recorded phone call to Bank-1 in connection with the opening of Renegade Account-3, ASAN stated, in substance and in part, that Renegade is a logistics company through which he procures and moves a wide variety of goods for clients, and ASAN described himself as a "jack of all trades."

    f. Renegade Account-4 was a business account opened at a bank headquartered in Ohio ("Bank-6") in the name of Renegade in or about February 2019.

    g. Renegade Account-5 was a business account opened at a bank headquartered in Massachusetts ("Bank-7") in the name

of Renegade in or about January 2019. The nature of business provided to Bank-7 for Renegade was "general freight trucking."

    h.    Between at least in or about January 2019 and at least in or about September 2019, the Renegade Accounts had deposits greater than approximately $500 that totaled approximately $1.63 million and withdrawals greater than approximately $500 that totaled approximately $1.32 million. A majority of the deposits in the Renegade Accounts consisted of large wire transfers from various individuals and businesses or cash deposits, and many of the withdrawals consisted of transfers to other accounts under the control of ASAN and CHARLES IFEANYI OGOZY, the defendant. In total, the Renegade Accounts transferred approximately $15,900 to accounts in the name of OGOZY.

25.    Based on my review of bank records for a bank account (the "Eldadoc Account") in the name of Eldadoc Consulting LLC ("Eldadoc") at a bank headquartered in New Jersey ("Bank-8"), I have learned the following, in substance and in part:

    a.    The Eldadoc Account was a business account opened at Bank-8 in the name of Eldadoc in or about January 2018.

    b.    JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, were the sole signatories on the Eldadoc Account.

    c.    Account opening information provided to Bank-8 stated, among other things, that OGOZY was the primary contact for Eldadoc and that Eldadoc's line of business was "public relations agencies."

    d.    The address for Eldadoc provided to Bank-8 was the Carteret Address.

    e.    The business phone number for Eldadoc provided to Bank-8 was the Ogozy Phone Number.

    f.    Between at least in or about February 2018 and at least in or about May 2018, the Eldadoc Account had deposits greater than approximately $500 that totaled approximately $298,000 and withdrawals greater than approximately $500 that totaled approximately $285,000. A majority of the deposits in the Eldadoc Account consisted of large wire transfers from various individuals and businesses or cash deposits, and many of

the withdrawals consisted of transfers to other accounts under the control of ASAN and OGOZY and third parties.

26. Based on my review of bank records for five bank accounts (collectively, the "Asan Accounts") in the name of JOSEPH IORHEMBA ASAN JR., the defendant, at four different banks, including Bank-1, I have learned the following, in substance and in part:

   a. ASAN was the sole beneficial owner and signatory of the Asan Accounts.

   b. The addresses for ASAN provided for the Asan Accounts included the Carteret Address, the Piscataway Address, and the Daytona Beach Address.

   c. The phone number provided in connection with the opening of the Asan Accounts was the Asan Phone Number.

   d. Between at least in or about November 2017 and at least in or about March 2019, the Asan Accounts had deposits greater than approximately $500 that totaled approximately $550,000 and withdrawals greater than approximately $500 that totaled approximately $516,000. A majority of the deposits and withdrawals in the Asan Accounts consisted of transfers to and from accounts in the name of Uxbridge, Renegade, and CHARLES IFEANYI OGOZY, the defendant, as well as other of the Asan Accounts. In total, the Asan Accounts transferred approximately $87,500 to accounts in the name of OGOZY and received approximately $22,000 in transfers from accounts in the name of OGOZY.

27. Based on my review of bank records for two bank accounts in the name of CHARLES IFEANYI OGOZY, the defendant (collectively, the "Ogozy Accounts") at two different banks, including Bank-1, I have learned the following, in substance and in part:

   a. OGOZY was the sole beneficial owner and signatory of the Ogozy Accounts.

   b. The addresses for OGOZY provided to the banks for the OGOZY Accounts included, among other addresses, the Carteret Address and the West Chester Address.

   c. The phone number provided by OGOZY in connection with the opening of the Ogozy Accounts was the Ogozy Phone Number.

    d. Between at least in or about March 2018 and at least in or about April 2019, the Ogozy Accounts had deposits greater than approximately $500 that totaled approximately $354,000 and withdrawals greater than approximately $500 that totaled approximately $223,000.  In total, accounts in the name of OGOZY received approximately $164,000 in transfers from accounts in the name of Uxbridge, Renegade, and JOSEPH IORHEMBA ASAN JR., the defendant.

  28. Based on my review of a September 29, 2018 recorded phone call made to a representative of Bank-1, I have learned the following, in substance and in part:

    a. The phone call was made from the Ogozy Phone Number.

    b. The male individual who made the call identified himself as JOSEPH IORHEMBA ASAN JR., the defendant, and stated, in substance and in part, that he was calling about his business account, Uxbridge Account-1.

    c. In order to access information regarding Uxbridge Account-1, the male individual who made the call provided the last four numbers of ASAN's social security number and ASAN's date of birth to the Bank-1 representative, but could not provide the "code word" for the account or the last six digits of the debit card associated with Uxbridge Account-1.

    d. Based on the circumstances of the call described above and records from Bank-1 establishing that CHARLES IFEANYI OGOZY, the defendant, regularly made calls to Bank-1 using the Ogozy Phone Number when OGOZY inquired about his personal account at Bank-1, I believe that OGOZY made the September 29, 2018 call to Bank-1 purporting to be ASAN.

  29. Based on my review of a March 13, 2019 recorded phone call made by JOSEPH IORHEMBA ASAN JR., the defendant, to a representative of Bank-1 inquiring why his accounts at Bank-1, namely Uxbridge Account-1, Renegade Account-3, and a personal account, were frozen due to indicators of fraudulent activity, I have learned that ASAN stated the following, in substance and in part:

    a. ASAN owns two business accounts and a personal account at Bank-1.

       b.    ASAN uses the Uxbridge account to collect payments for advisory services he performed.

       c.    ASAN uses the other business account, namely Renegade Account-3, for a logistics company in order to procure goods for clients and receive wire payments.

       d.    One of the wires ASAN received was "kind of fraudulent" because that wire did not come from where ASAN expected it would come from, which ASAN realized "after the fact."

       e.    ASAN sent a payment for a car to "Charles Ogozy" whose account was also blocked. Ogozy was ASAN's roommate for over a year and they were buddies in the U.S. Army.

    30.    Based on my review of recorded phone calls made by CHARLES IFEANYI OGOZY, the defendant, from the Ogozy Phone Number between March 12 and April 1, 2019 to representatives of Bank-1 inquiring why his personal account at Bank-1 was frozen due to indicators of fraudulent activity, I have learned the following, in substance and in part:

       a.    In connection with an inquiry from a Bank-1 representative regarding transfers OGOZY sent and received from JOSEPH IORHEMBA ASAN JR., the defendant, OGOZY stated, in substance and in part, that OGOZY and ASAN used to live together and that OGOZY sold ASAN a car.

       b.    OGOZY was aware that ASAN had recently spoken to Bank-1 regarding ASAN's frozen accounts and that ASAN had told Bank-1 that everything was fine.

       c.    In connection with a discussion regarding the amount of time Bank-1 needed to investigate OGOZY's account, OGOZY represented himself to be "an AML professional," which I believe is a reference to his purported experience in anti-money laundering, and OGOZY stated, in substance and in part, that he had never seen an investigation take so long.

       d.    OGOZY does not have any employment apart from his work with the military.

    31.    Based on my training and experience, my participation in this investigation, and my conversations with other law enforcement agents and others, I know that the deposits of Bank-2 through Bank-8 were insured by the FDIC at all relevant times,

32. Based on my review of flight records, I have learned that JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, both traveled from different locations in the United States to St. Maarten in the Caribbean Sea on or about August 16, 2019 and returned on the same flight to Atlanta, Georgia on or about August 19, 2019.

WHEREFORE, I respectfully request that warrants be issued for the arrests of JOSEPH IORHEMBA ASAN JR. and CHARLES IFEANYI OGOZY, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
VINCENT Q. LAI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
29th day of October, 2019

_____
THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK